UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANDREA PARRIS | * | |
| Plaintiff | * | |
| | * | |
| v. | * | CIVIL NO. L-09-0704 |
| | * | |
| BOARD OF EDUCATION OF | * | |
| BALTIMORE COUNTY | * | |
| Defendant | * | |

*******

MEMORANDUM

This is an employment discrimination case. Andrea Parris ("Parris") alleges that the Baltimore County Board of Education (the "Board") discriminated against her on the basis of her race and engaged in acts of retaliation against her. Now pending is the Board's Motion for Summary Judgment. Docket No. 31. The Motion is fully briefed, and no hearing is deemed necessary. See Local Rule 105.6 (D. Md. 2010). For the reasons stated herein, the Court will, by separate Order of even date, GRANT the Motion IN PART and DIRECT the parties to engage in further discovery.

I.    **Background**

The facts are fully set forth in the parties' briefs and need not be restated herein. The essential facts are as follows.

Andrea Parris is an African-American female. Since 1997, she has worked as a teacher and assistant principal in several school systems. The events giving rise to the instant suit began in 2004. At that time, Parris was serving as the assistant principal at Woodlawn High School ("Woodlawn"). In mid-June 2004, the Board transferred Parris from Woodlawn to Western School of Technology ("Western").

Shortly after starting at Western, Parris came to believe that the studentry was being disciplined in a racially discriminatory manner. Parris raised this issue with her colleagues and demanded an investigation. When her supervisor declined to investigate the matter, Parris filed a charge with the Equal Employment Opportunity Commission (the "E.E.O.C.") alleging race and gender discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964.[1] Parris also requested a transfer to a different school. In mid-August, at the request of Parris's counsel, the Board transferred Parris to Towson High School ("Towson").

While at Towson, Parris complained that Dr. Jane Barrenger, her supervisor, was allocating responsibilities in a racially discriminatory manner. After Parris acted hostilely towards Barrenger, Barrenger formally reprimanded her. Shortly thereafter, the Board transferred Parris from Towson to Sollers Point Technical High School ("Sollers Point"). The Board assigned Parris to the position of assistant principal at Sollers Point, and her first year at the school passed without incident. On July 10, 2006, Parris filed a discrimination/retaliation charge with the E.E.O.C. arising from the assignment of responsibilities at Towson.[2]

Meanwhile, Parris remained convinced that she and the students at Western had been subjected to discrimination. Previously, Parris had contacted the NAACP and requested the organization to investigate her allegations. The NAACP declined to do so. In July 2007, Parris sent an email to Dr. Ella White-Campbell, a local community activist, in which Parris expressed her frustration with the NAACP's decision. The message included language that is critical of Baltimore County Public Schools ("BCPS") and could be construed as hostile and threatening. The pertinent parts of the email are as follows:

---

[1] On May 24, 2006, the E.E.O.C. issued a Dismissal and Notice of Rights to Parris.
[2] On November 20, 2006, the E.E.O.C. issued a Dismissal and Notice of Rights to Parris.

I have undergone enormous stress and frustration as a result of what I experienced at Western . . . and the school system has done nothing to settle this matter satisfactorily, accept [sic] deny the allegations. The handling of the case did not make things better but worse and even the more bitter! I am extremely angered and disgusted at the fact that I went to the NAACP, a supposedly independent civil rights organization, for assistance and they in essence sold out the victim to protect the employer and individuals in the school system for which they have a relationship. <u>It makes you wonder why people go into places of employment and kill people. What causes them to snap!</u> Its [sic] things like this! Employment harassment is damaging, sometimes irreparable, and devastating but the results to those who caused it can als o [sic] at times be devastating. <u>I hope I never snap.</u>

. . .

[BCPS superintendent Hairston] <u>doesn't really give a dam about black employees. I know because I am one and I am suffering because of it.</u> Advise Margaret Ann Howie that this situation is taking a turn for the worse.

D.'s Ex. 54 (first and second emphasis added, third emphasis original).

After reading the message, Campbell contacted the Baltimore County Police Department and forwarded the message to Dr. Donald Peccia, BCPS's Assistant Superintendant of Human Resources. After Peccia read the message, he contacted BCPS's Legal Office and the Baltimore County Police Department. The Police Department investigated the message but concluded that Parris did not pose an imminent threat to school safety.

Nevertheless, on August 9, 2007, Peccia met with Parris and informed her that she was being reassigned to a classroom teacher position. In a letter dated August 13, 2007, Peccia memorialized the meeting with Parris. He explained that the email "reflected extremely poor judgment, [and was] unprofessional, negative and damaging to the school system." D.'s Ex. 57. Peccia also stated that, under the superintendent's rules, assistant principals must "[a]ssist in creating a productive working climate" and "communicate effectively with students, staff, administrative and supervisory personnel, parents, and community." <u>Id.</u> Peccia concluded that Parris had "failed to act in a professional and respectful manner" and ordered her to report to

duty as a regular classroom teacher at Parkville High School.  Id.  Finally, Peccia informed Parris

that she could be disciplined if in the future she failed to communicate "in a professional

manner."  Id.

On August 16, 2007, Parris filed a third charge with the E.E.O.C., alleging continuing

acts of discrimination and retaliation.  This charge focused on Parris's claims of retaliation and

constructive discharge based on her transfer and reassignment from Sollers Point to Parkville.

Parris then resigned before ever reporting to Parkville.  In January 2008, she began working for

the New York City Department of Education as a school principal.

The E.E.O.C. issued a Dismissal and Notice of Rights regarding Parris's third charge on

December 11, 2008.  Parris filed the instant suit in the Circuit Court for Baltimore County on

February 17, 2009.  Her Complaint includes five counts, as follows: Race Discrimination and

Retaliation under Title VII (Counts I and II); Constructive Discharge under Title VII (Count III);

Retaliatory Misrepresentations to Prospective Employers under Title VII (Count IV), and

Intentional Interference with Prospective Economic Advantage under Maryland law (Count V).

Parris seeks compensatory and emotional distress damages, back pay, restitution of forfeited

benefits, reinstatement, attorney's fees, and costs.

The Board removed the case to this Court and filed its Answer.  After the close of

discovery, the Board filed the instant Motion for Summary Judgment, which became ripe on

September 10, 2010.

**II.    Discussion**

As discussed above, Parris's case centers on her allegation that the Board engaged in

unlawful employment practices when it transferred her from Towson to Sollers Point and

reassigned her from assistant principal at Sollers Point to classroom teacher at Parkville.[3]  Parris also alleges that the Board interfered with her application for a position with the Long Island School Board.  The Board contends that it is entitled to summary judgment on all of Parris's claims.

## A.    Standard of Review

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).  In determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).  Hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment.  See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995).

## B.    Analysis

The Board's motion rests on two alternate grounds.  First, the Board contends that Parris cannot make out a prima facie case for any of her claims.  Second, the Board offers legitimate, nondiscriminatory reasons for each of its employment actions.  The Court will consider these arguments as they apply to each of Parris's claims.

---

[3] The transfer from Western to Towson and the assignment of responsibilities at Towson are not at issue.

### 1.	Discrimination and Retaliation under Title VII (Counts I and II)

In Counts I and II, Parris alleges that the Board discriminated against her on the basis of her race and retaliated against her for engaging in protected activity.  Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The statute also prohibits an employer from discriminating against an individual because he or she opposed an "unlawful employment practice" or because he or she has "made a charge, testified, assisted, or participated . . . in an investigation, proceeding, or hearing under [Title VII]."  § 2000e-3(a).

It is undisputed that Parris has no direct evidence of discrimination.  Therefore, she must proceed under the familiar burden-shifting scheme set forth in McDonnell Douglas v. Green, 411 U.S. 792, 803 (1973).  To create a prima facie case of discrimination, Parris must establish: (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that at the time of the action, her performance was satisfactory, meeting the Board's legitimate expectations, and (4) that she was treated less favorably than persons who are not members of the protected class.  See E.E.O.C. v. Clay Printing Co., 955 F.2d 936, 941 (4th Cir. 1992).

To create a prima facie case of retaliation, Parris must establish: (1) that she engaged in protected activity; (2) that the Board took adverse employment action against her, and (3) that a causal connection existed between the protected activity and the adverse action.  Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989) (citing Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985)).  If Parris can make out a prima facie case, the Board may nevertheless proffer a legitimate, non-discriminatory reason for the adverse employment action.  Id.  If the Board meets this burden, Parris has the ultimate burden to prove by a

preponderance of the evidence that the Board's proffered reasons were merely a pretext for discrimination.  Id.

### a. Discrimination

Parris's discrimination claim fails because she has offered no evidence that she was treated less favorably than other non-African American employees.  Parris acknowledges as much in her Opposition, which only addresses her retaliation claims.  Accordingly, the Board is entitled to summary judgment on Parris's discrimination claims.

### b. Retaliation

In Counts I and II, Parris also claims that the Board retaliated against her in violation of Title VII by transferring and reassigning her as discussed above.  The Court will address each of these claims in turn.

### i. Towson to Sollers Point

To establish a prima facie claim of retaliation, Parris must prove several elements, including that the Board took an adverse employment action against her.  See, e.g., Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007).  The Fourth Circuit defines an adverse employment action as a "discriminatory act which adversely affect[s] the terms conditions, or benefits of the plaintiff's employment."  James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (internal quotation marks omitted).  A new job assignment cannot form the basis of a valid Title VII claim unless the plaintiff can show that the new assignment "had some significant detrimental effect."  Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999); see Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to

promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

Here, it is undisputed that Parris did not lose pay, benefits, or seniority as a result of the transfer from Towson to Sollers Point. Further, her responsibilities at each school were substantially the same. Under these circumstances, no reasonable juror could conclude that the transfer from Towson to Sollers Point had a significant detrimental effect upon Parris.

Nevertheless, Parris argues that the transfer violated Title VII because "frequent transfers reduce future job opportunities." P.'s Opp. 14. The Fourth Circuit has observed that, under some circumstances, an employment action might be adverse if it has a negative impact on future professional opportunities. See James, 368 F.3d at 377. The Fourth Circuit has cautioned, however, that such claims cannot survive summary judgment on speculation alone. Id. ("Inasmuch as James departed the company before he even came up for a promotion, we are left to guesswork and conjecture as to what his prospects would have been. James' speculations about the impact of his reassignment . . . are merely that—stark assertions that are not sufficient to survive summary judgment.").

Parris has offered no evidence that she was denied a promotion or any other opportunity for professional development because of her frequent transfers.[4] The sole evidence she cites in favor of her theory is that "[c]ommon sense alone confirms that employees who are repeatedly transferred are suspect in the eyes of current and potential employers." D.'s Opp. at 14. Although the Court recognizes the natural appeal of this argument, a plaintiff must offer more than her own opinion to defeat a motion for summary judgment.

_____

[4] In fact, Diane Young, principal of Sollers Point, testified that experience at two different schools can actually be beneficial to future promotion. See D.'s Ex. 4-A at 7 ("[T]o become a principal . . . you need experience at two different schools.").

The Board argues that Parris cannot make out a prima facie case of retaliation based on the reassignment from assistant principal at Sollers Point to classroom teacher at Parkville.[5]  The Board contends that Parris's claim is flawed because she cannot make out a causal connection between the reassignment and the exercise of protected activity.

Title VII protects two types of activity: opposition and participation.  Participation in the E.E.O.C. process is protected.  It is undisputed that Parris's final E.E.O.C. act occurred in November 2006, when she amended the E.E.O.C. complaint she had filed in July 2006.  The Board did not transfer and reassign Parris until August 2007, some nine months later.  Under the case-law, this interval of time eliminates any inference of retaliation.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (holding that the "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" must be "very close" in order to serve, without more, as "sufficient evidence of causality"); see also Pascual v. Lowe's Home Centers, Inc., 193 Fed. Appx. 229, 232 (4th Cir. 2006) (noting that three to four months between termination and protected activities weighs against finding a causal connection).

Because the temporal connection regarding her E.E.O.C. participation is weak, Parris urges the Court to hold that her email to Campbell, which she sent approximately one month before she was transferred, constitutes protected opposition activity.  Protected opposition activity includes "staging informal protests and voicing one's own opinions in order to bring

---

[5] The Board errs in contending that the reassignment was not an adverse action.  When the Board reassigned Parris to the position of classroom teacher, it significantly reduced her responsibilities.  A reduction in responsibilities, even if not accompanied by a decrease in pay, is an adverse action under Title VII.  See, e.g., Boone v. Goldin, 178 F.3d 252, 255-57 (4th Cir. 1999) (finding that transferring an employee to a new position is not an adverse employment action "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion").

attention to an employer's discriminatory activities, as well as 'complain[ts] . . . about suspected

violations.'" E.E.O.C. v. Navy Federal Credit Union, 424 F.3d 397, 406 (4th Cir. 2006)

(citations omitted).

Before turning to whether the email meets the definition of protected activity, a brief

review of its contents is in order. As mentioned above, Parris's email to Campbell expresses

consternation at the NAACP's decision not to investigate:

> I am extremely angered and disgusted at the fact that I went to the NAACP, a
> supposedly independent civil rights organization, for assistance and they in
> essence sold out the victim to protect the employer and individuals in the school
> system for which they have a relationship. It makes you wonder why people go
> into places of employment and kill people. What causes them to snap! Its [sic]
> things like this! Employment harassment is damaging, sometimes irreparable,
> and devastating but the results to those who caused it can als o [sic] at times be
> devastating. I hope I never snap.

Id. (emphasis added). She concludes the message, "[Hairston] doesn't really give a dam

[sic] about black employees. I know because I am one and I am suffering because of it.

Advise Margaret Ann Howie that this situation is taking a turn for the worse" (emphasis

original).[6]

Boiled down to its essence, the email is an attempt to persuade Campbell to pressure the

NAACP into investigating Parris's allegations of discrimination. Because the email seeks to

bring to light Parris's claims of discrimination, it constitutes protected opposition activity.

Although Parris has established a prima facie case of retaliation, she acknowledges that

the email provided the Board with a legitimate, non-discriminatory reason for the adverse action.

As mentioned above, Campbell forwarded the email to Donald Peccia, BCPS's Assistant

Superintendant of Human Resources. Peccia testified that, upon reviewing the email, he became

---

[6] That same day, Parris also wrote a letter to Maryland Governor Martin O'Malley. Although
not as overtly hostile towards BCPS and Dr. Hairston, Parris nevertheless remarks that "[p]ublic
humiliation is very dangerous in the work place!". D.'s Ex. 55.

concerned about the safety of the students and staff who would be supervised by Parris. Peccia also testified that, in his view, Parris's conduct was not befitting of a BCPS supervisor. In his letter to Parris, Peccia wrote that he was reassigning her because her actions were "unprofessional, negative, and damaging to the school system."

Nevertheless, Parris argues that these reasons were a pretext masking retaliation. The Court is mindful that the burden to establish pretext is not impossible to meet. Because the case is at the summary judgment stage, Parris need only come forward with sufficient evidence such that a reasonable jury could conclude, by a preponderance, that the Board's stated reasons were pretextual or otherwise not worthy of credence. See Henson v. Liggett Group, Inc., 61 F.3d 270, 273 (4th Cir. 1995).

Parris has offered no direct evidence to refute Peccia's stated reasons for reassigning her. Her circumstantial evidence centers on two theories: (i) that, before recommending the reassignment, Peccia failed to adequately consider Parris's employment history and her reasons for writing the email, and (ii) that the reassignment did not occur through the regular personnel channels. The Court will address each of these contentions in turn.

It is undisputed that Peccia made the decision to reassign Parris based on the email alone. He failed to investigate her employment history, including her history of good evaluations, and he failed to investigate the alleged inequity that motivated her to write such a passionate message. Parris claims that the superficiality of Peccia's review demonstrates that he seized on the email as a convenient excuse to reassign her. This theory is flawed because Parris acknowledges in her papers that the email alone provided Peccia with cause to terminate her. She cannot, therefore, argue that the Board was required to look beyond the email and consider her employment history.

Parris's second theory, that the reassignment did not occur through the regular personnel channels, requires further factual development before it can properly be considered. Peccia testified that he met with the Law Office regarding the email, that he met with Parris to explain his recommendation, and that he sent Parris a letter memorializing their meeting. Peccia did not recall whether he spoke with Hairston before meeting with Parris, and Hairston did not recall whether he spoke with Peccia at any point in the process.

The Court cannot consider this issue without a more complete understanding of the Board's personnel procedures and whether, and to what extent, the Board followed those procedures in this case. The parties must address several gaps in the record, including: What is the standard protocol for reassigning personnel from the position of assistant principal to teacher? What written policies and procedures must be followed? What record must be created? Who must approve the decision? Must the decision be approved prospectively, or can it be approved retroactively? Must the approval be in writing? What facts and evidence, if any, must be considered by the ultimate decision makers? Were these policies and procedures followed in this case? What record exists in this case?

The Board should supply further affidavits on these issues. Parris may take the deposition, subject to a one hour maximum, of each person who supplies an affidavit. A separate order will set a discovery deadline and briefing schedule. The Court will decide whether to hold a hearing after reviewing the papers.

### 2. Constructive Discharge (Count III)

In Count III, Parris alleges that the Board constructively discharged her from her employment by reassigning her to Parkville in August 2007. A plaintiff alleging constructive discharge under Title VII must prove two elements: "deliberateness of the employer's action, and

intolerability of the working conditions." Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985). The Fourth Circuit has cautioned that the claim of constructive discharge must be "carefully cabined" to guard against "those who leave employment of their own accord." Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 187 (4th Cir. 2004) (citations omitted).

Parris has failed to prove either of the necessary elements. With respect to the first, there is no evidence, either direct or circumstantial, that the Board assigned Parris to Parkville with the intent of inducing her to quit. Rather, the Board reasonably concluded that Parris was no longer fit to serve in a leadership capacity and, therefore, it assigned her to a classroom teaching position. See Hill v. Verizon Maryland, Inc., No. RDB-07-3123, 2009 WL 2060088, *13 (D. Md. July 13, 2009) ("Deliberateness is hard to prove, and otherwise benign business decisions are granted much deference.").

Parris also cannot establish that the working conditions were intolerable. "Intolerability of working conditions . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." Bristow, 770 F.2d at 1255. Parris resigned before ever reporting to Parkville, and she offers no evidence regarding the working environment at the school.

Nevertheless, Parris claims that the Board's " 'intransigence' in failing or refusing to remedy race discrimination in the workplace, its retaliatory conduct, and its decision to demote her . . . left her no alternative other than resignation." D.'s Opp. 10-11. This allegation rests entirely upon Parris's subjective beliefs. As discussed above, Parris has offered no objective evidence that the Board operated in a racially discriminatory manner or that her working conditions were intolerable. See James, 368 F.3d at 378 ("[M]ere dissatisfaction with working assignments . . . or difficult or unpleasant working conditions are not so intolerable as to compel

a reasonable person to resign.").  In fact, Parris concedes that "a jury . . . could find that [she] 'overreacted' to the demotion by resigning."  P.'s Opp. 25.  Under these circumstances, no reasonable jury could find that Parris was constructively discharged.

### 3. Retaliatory Misrepresentation to Prospective Employers and Intentional Interference with Prospective Economic Advantage

In Counts IV and V, Parris alleges that following her resignation from Parkville, the Board prevented her from obtaining employment with the Long Island Board of Education (the "LIB") by disseminating negative information about her.  To establish a claim of retaliatory misrepresentation to prospective employers, Parris must establish (1) that disparaging comments were made; (2) that a prospective employer heard the disparaging comments; and (3) that the prospective employer denied Parris employment as a result of the negative references.  See Niedermeier v. Office of Baucus, 153 F. Supp. 2d 23, 31 (D.D.C. 2001).  The elements of intentional interference with prospective economic advantage under Maryland law are similar. See K & K Management, Inc. v. Lee, 316 Md. 137, 155 (1989).[7]

Parris's claims fail because she has offered no evidence that the LIB denied her employment, or that she otherwise suffered damage, as a result of negative references from the Board.  In fact, the record is devoid of any evidence concerning the LIB's decision-making process.  Parris cannot raise a dispute of material fact by relying on mere speculation. Accordingly, the Board is entitled to summary judgment on these claims.

---

[7] Parris must establish (1) that the Board committed an intentional and willful act; (2) that the act was calculated to cause damage to Parris in her lawful business; (3) that the Board committed the intentional and willful act with the unlawful purpose to cause such damage and loss, without right or justifiable cause; and (4) that Parris suffered actual damage as a result of the act.  Id.

## III.    Conclusion

For the reasons stated herein, the Court will, by separate Order of even date, GRANT the

Motion IN PART and DIRECT the parties to engage in further discovery.


Dated this   7th   day of    December    2010.          _____/s/_____
                                                        Benson Everett Legg
                                                        United States District Judge